# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ERIKA STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 8710 |
| v. | ) | |
| | ) | |
| TARA SHELTON, ET AL., | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Erika Stevens, a Chicago Public School teacher, brings this action against defendants Tara Shelton, Andrew Rhodes, Patricia Davlantes and the Board of Education of the City of Chicago (the "Board") to redress discrimination, harassment and retaliation due to her alleged disability and participation in protected union activity. Specifically, Stevens alleges discrimination, failure to accommodate, retaliation and interference by the Board under the Americans with Disabilities Act, 42 U.S.C. §§ 12112(a), (b)(5), and 12203(a) and (b), and violations by some or all of the defendants of her constitutional rights pursuant to 42 U.S.C. § 1983. Stevens also brings claims for defamation *per se*, false imprisonment and battery. Currently before the Court is Defendants' partial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), R. 25. For the following reasons, the Court grants in part and denies in part Defendants' motion.

## Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Background

Stevens taught advanced math at South Loop Elementary School for over 8 years prior to the events giving rise to her lawsuit. R. 21-1 ¶ 4. At all relevant times, defendant Tara Shelton was the principal of South Loop Elementary, defendant

Andrew Rhodes was the assistant principal, and defendant Patricia Davlantes was South Loop Elementary's resident principal.[1] *Id.* ¶¶ 5-7. Shelton, Rhodes and Davlantes supervised Stevens, and all are Board employees. *Id.* ¶¶ 4-8.

Stevens alleges that she was diagnosed with a medical condition in or about summer 2013 that causes potentially incapacitating reactions to stress. *Id.* ¶¶ 14-15. Stevens informed Shelton of her condition shortly after diagnosis and explained that she would need to take sick days to address symptoms. *Id.* ¶¶ 17, 22-24. Thereafter, Stevens took time off to address symptoms, but typically did not exceed her allotted sick time. According to Stevens, both her job performance and her students' performance remained strong. *Id.* ¶¶ 16, 19.

Nevertheless, in the fall of 2014, Shelton became upset with Stevens taking so much time off, demanded that she stop, and evaluated Stevens negatively when she continued to do so. *Id.* ¶¶ 18, 21, 25. Then Shelton began interrupting Stevens's classes, at one point taking over Stevens's lesson, and eventually assigned an assistant teacher to Stevens's classroom over her objection. *Id.* ¶¶ 26-29. At some point, Shelton and Stevens met with Stevens's representative from the Chicago Teachers Union.[2] Stevens's union representative asked Shelton whether she treated Stevens poorly because of her medical condition. Shelton allegedly replied that

---

[1] Apparently candidates selected as "resident principals" complete a one-year principal-in-training internship program working with high-performing CPS principals. *See* https://cps.edu/PrincipalQuality/Pages/Pipeline.aspx.

[2] The timing of this meeting is unclear from Stevens's amended complaint, but not relevant to the resolution of Defendants' motion to dismiss.

Stevens "did miss a lot of days." *Id.* ¶¶ 40-41. According to the union representative, Shelton was "singling" Stevens out, as "no other teacher faced this kind of treatment." *Id.* ¶ 42.

Then, in or about September 2016, Shelton imposed a new rule requiring teachers to explain how each work assignment related to grade level teaching goals. *Id.* ¶ 31. Stevens felt the rule imposed unnecessary work, particularly for her, because her students performed at varying levels above grade level. *Id.* ¶ 32. At some point thereafter, Stevens filed a class grievance with the union complaining about the rule. *Id.* ¶ 33. According to Stevens, Shelton then began retaliating against her on a daily basis. *Id.* ¶¶ 34-35. Stevens specifically complains that in May 2017, Shelton began interfering with student examinations, including by cancelling student testing or removing Stevens's students from her classroom during testing, questioning her students about whether Stevens was cheating on tests, and encouraging them to accuse her of cheating.[3] *Id.* ¶¶ 38, 56-57. She also alleges that Shelton interrupted Stevens's class, gave students incorrect information about their lessons, began "observing" her classes to create new and increasing demands, started writing Stevens up for overusing certain instruction methods despite that her students were performing well, and yelled at her for taking her students outside, despite other teachers being permitted to do so. *Id.* ¶¶ 34-37, 49, 57. According to Stevens,

---

[3] The Court assumes that when Stevens alleges that Defendants accused her of cheating, she means that Defendants accused her of impermissibly assisting her students during testing in some way.

Davlantes also interfered with her students' examinations, including by being disruptive and cutting testing short. *Id.* ¶ 39, 43-44, 48.

On or about June 2, 2017, Defendants again removed Stevens's students from her classroom for testing. Davlantes asked Stevens to leave the testing room, but Rhodes physically blocked her exit, grabbing her arm.[4] *Id.* ¶¶ 50-53. Davlantes and Rhodes suspended testing. *Id.* ¶ 54.

Finally, on June 7, 2017, Shelton told Stevens that she was being investigated for cheating on student examinations and instructed her to leave school property. *Id.* ¶ 61. Shelton asked for the keys to Stevens's file cabinet before she left. *Id.* ¶ 62. Stevens refused to turn the keys over. Shelton blocked her exit and called the police. *Id.* Over an hour later, apparently because neither Shelton nor Stevens backed down, a Board attorney and a Union attorney arrived and Stevens left. *Id.* ¶ 63. Stevens complains that Defendants did not follow proper procedure when Shelton "removed and excluded" her from school property. *Id.* ¶ 70. The Board brought termination charges against Stevens, and a hearing was held on September 10 and November 2, 2018. *Id.* ¶ 72; R. 42. The parties informed the Court that they have received the hearing officer's Findings and Recommendation, and that the Board will decide whether to accept the Findings and Recommendation at the April 24, 2019 Board meeting.

---

[4] Although it is unclear from Stevens's amended complaint, the Court assumes that Stevens's students were removed from her classroom for testing, Stevens followed her students, but was then asked to leave the room.

Stevens filed this action on December 1, 2017. R. 1. On April 5, 2018, Defendants moved to dismiss portions of Stevens's complaint for failure to state a claim under Rule 12(b)(6). R. 18. Then, on April 24, 2018 and with the Court's permission, Stevens filed an amended complaint, which counsel indicated would remedy some of the deficiencies about which Defendants complained in their motion. R. 21. Thereafter, on May 17, 2018, Defendants filed another motion to dismiss, pointing out that Stevens's amended complaint was "almost *identical*" to the original and "the amendment did not cure the deficiencies." R. 25 at 1 (emphasis in original).

The allegations outlined earlier have given rise to a virtual smorgasbord of constitutional, federal statutory and state law claims. Specifically, Stevens's amended complaint alleges:[5] (1) the Board discriminated against her based on her disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(a) (Count I); (2) the Board failed to accommodate her disability in violation of the ADA, 42 U.S.C. § 12112(b)(5) (Count II); (3) the Board retaliated against her in violation of, and interfered with her rights under, the ADA, 42 U.S.C. § 12203(a) and (b) (Count III); (4) the Board and the individual defendants retaliated against her in violation of her First Amendment rights because she filed a grievance with her union (Count IV); (5) the Board and the individual defendants violated Stevens's Fourteenth Amendment right to equal protection when they harassed and retaliated against her

---

[5] Stevens incorrectly numbered the counts in her complaint; it contains two Count VI's, and from there jumps to Counts IX, X and XI. The Court's opinion reflects Stevens's numbering for clarity, although her due process claim will be renumbered as Count VI(a), and her Fourth Amendment claim as Count VI(b).

for filing the grievance and/or because she was a "successful teacher" (Count V); (6) the Board and the individual defendants violated Stevens's Fourteenth Amendment rights when they removed her from South Loop Elementary and suspended her without following established process (Count VI(a)); (7) the Board and Shelton refused to allow Stevens to leave when Shelton told Stevens she was suspended in violation of her Fourth Amendment rights (Count VI(b)); (8) Shelton engaged in defamation *per se* when she falsely accused Stevens of cheating on standardized tests (Count IX); (9) Rhodes committed battery against her when he grabbed her arm and blocked her path (Count X); and (10) Shelton falsely imprisoned Stevens when she refused to allow her to leave the building following her notice of suspension (Count XI). Stevens purports to bring all claims against one or more individual defendants in both their individual and official capacities. She alleges that Shelton's accusations of cheating have affected her professional reputation, and that student examination performance is a major basis upon which teachers are evaluated. *Id.* ¶¶ 45, 66. She asserts that she has been unable to teach summer school or seek a position with an after-school program and has not been paid since filing her initial complaint. *Id.* ¶¶ 69, 72. She seeks a reinstatement order, actual damages, interest, restoration and make-whole relief, an order prohibiting the Board from "any further prohibited discrimination against her," declaratory orders that the Board violated her Constitutional rights, compensatory damages, punitive damages, attorney's fees, costs and presumed damages. R. 21-1 at 10-20. Defendants' motion requests dismissal of Stevens's ADA failure to accommodate, Section 1983, defamation *per se* and false

imprisonment claims, and that the Court strike Stevens's prayers for punitive damages. R. 38 at 15.

## Analysis

Defendants allege that Stevens's complaint fails to state a claim in several respects. The Court will address each argument in turn.

## I.  Failure to Accommodate

At the outset, Defendants argue that Stevens's failure to accommodate claim (Count II) fails because Stevens does not allege that the Board failed to give her time off to address her medical condition, or otherwise failed to reasonably accommodate her. R. 25 at 5. Stevens's claim alleges that the Board, through Shelton, "discriminated against Ms. Stevens due to her disability," and that Shelton "heightened her harassment of Ms. Stevens at least in part for using her sick time to address her disability." R. 21-1 ¶ 80. But the Court agrees with Defendants that her claim does not allege any facts to indicate Defendants failed to accommodate her— either through granting time off or otherwise. And Stevens's brief offers no argument at all regarding Count II. *See generally* R. 31-1. Accordingly, the Court grants Defendants' motion with respect to Count II. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011) ("[A] party waives an argument by failing to make it before the district court. We apply that rule where a party fails to develop arguments related to a discrete issue, and . . . where a litigant effectively abandons the litigation by not responding to alleged deficiencies in a motion to dismiss."); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("Our system of justice is

adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning. An unresponsive response is no response. In effect the plaintiff was defaulted for refusing to respond to the motion to dismiss.").

## II.    Constitutional Claims Against the Board and the Individual Defendants in their Official Capacities

Next, Defendants contend that Stevens's Section 1983 claims against the Board (Counts IV, V, VI(a) and VI(b)) fail under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) and its progeny. R. 25 at 5. To proceed against the Board under *Monell*, Stevens must plausibly allege that "an official policy or custom not only caused the constitutional violation, but was the 'moving force' behind it." *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007). To demonstrate the existence of an "official policy," Stevens must plausibly allege:

> (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Id.* at 515. Defendants contend that Stevens has failed to plausibly allege facts constituting an "official policy" under any of the three methods. In response, Stevens argues that her allegations that Shelton was the ultimate decisionmaker, as principal of South Loop Elementary, are enough for her claims to survive under the third method of establishing municipal liability. R. 31-1 at 2-3.

Stevens pleads herself out of court; in her amended complaint, Stevens acknowledges that Shelton was not the final decisionmaker, let alone the final policymaker as *Monell* requires. R. 31-1 ¶¶ 93, 97, 102, 107 (alleging Shelton "has final decision making [sic] authority to *begin* the termination process" with respect to Stevens (emphasis added)). Courts have held time and again that school principals do not have final policymaking authority with respect to personnel decisions for purposes of a *Monell* claim in any event. *See Darchak v. City of Chic. Bd. Of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) ("State law determines who legally constitutes a final policymaker, and Illinois law clearly assigns responsibility for personnel decisions to the Board, not to individual school principals: 'The right to employ, discharge, and layoff shall be vested solely with the board . . .' 105 ILCS 5/34–8.1" (internal citations omitted)); *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998) ("Nothing in the [Illinois] School Code allows us to infer that a . . . principal has been delegated policymaking authority with respect to personnel decisions."); *Silverman v. Bd. of Educ. of City of Chic.*, 2010 WL 3000187, at *10 (N.D. Ill. July 26, 2010) ("Illinois law . . . expressly states that the principal shall only submit recommendations regarding appointment, retention, or promotion to the superintendent," and "the School Code specifically states that the right to employ, discharge, and layoff shall be vested solely with the [B]oard" (internal citations omitted)); *Thompson v. Bd. of Educ. of City of Chic.*, 2014 WL 1322958, at *4 (N.D. Ill. Apr. 2, 2014) ("school principals who allegedly made the contested decisions are not final policymakers for the Board").

Thus, Shelton is not a "final policymaker" as Stevens claims. And Stevens does not allege that either Davlantes or Rhodes are "final policymakers." Accordingly, the Court grants Defendants' motion to dismiss Stevens's constitutional claims (Counts IV, V, VI(a) and VI(b)) against the Board. Stevens's official capacity claims against the individual defendants—which are duplicative—are also dismissed. *See Brandt v. Bd. of Educ. of City of Chic.*, 420 F. Supp. 2d 921, 936 (N.D. Ill. 2006) (dismissing official capacity claims as duplicative of claims against the Board, noting that such official capacity claims are "another way of pleading an action against an entity of which an officer is an agent." (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))); *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) ("[a]n official capacity suit is tantamount to a claim against the government entity itself").

## III. Constitutional Claims Against the Individual Defendants in their Individual Capacities, and False Imprisonment Claim

### A. First Amendment Retaliation Claim

Defendants next argue that Stevens's First Amendment retaliation claim (Count IV) fails as to all defendants because Stevens was not engaged in protected speech when she filed her union grievance challenging the "unreasonable and oppressive work rule[ ]" requiring teachers to "explain how each work assignment related to grade level teaching goals." R. 25 at 8-9; R. 38 at 7-8; R. 21-1 ¶¶ 31-33. Instead, Defendants argue that Stevens's union grievance was "nothing more than a private personnel dispute with her supervisor." R. 25 at 9.

Generally, the *Connick/Pickering* analysis governs whether an individual has a protected First Amendment right. *Kuchenreuther v. City of Milwaukee*, 221 F.3d

867, 973 (7th Cir. 2000). That analysis involves two steps. First, a determination as to whether the speech can be "fairly characterized" as speech "on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146 (1983). And, if that hurdle is cleared, a balancing of the interests of the citizen making the speech against those of "the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering v. Bd. of Educ. of Twp. H.S. Dist. 205*, 391 U.S. 563 (1968)). Whether speech addresses a matter of public concern is a question of law for the court. *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010).

Protected "public concern" speech includes anything "that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of the publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004). But speech is not protected merely because it touches on an issue that the public may find interesting. *Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 586 (7th Cir. 1992). Indeed, "[e]ven if the speech in question is on a topic of public *interest,* determining whether speech addresses a matter of public *concern* requires courts to 'delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public.'" *Craig v. Rich Twp. High Sch. Dist. 227*, 2013 WL 608411, at *2 (N.D. Ill. Feb. 19, 2013), *aff'd on other grounds*, 736 F.3d 1110 (7th Cir. 2013) (citing *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir. 1999)); *see also Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2013) ("[I]n answering this question we look to the 'content, form, and context' of the statement." (quoting *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009))). The speech's content is the

most important factor in determining whether it addresses a matter of public concern. *Kristofek*, 712 F.3d at 984. But context also matters. "[T]he fact that [a plaintiff] ha[s] a personal stake in expressing his views does not, by that reason alone, remove his expression from First Amendment protection." *Campbell v. Towse*, 99 F.3d 820 (7th Cir. 1996). But if "the objective of the speech . . . is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern." *Kristofek*, 712 F.3d at 986; *see also Gross*, 619 F.3d at 706 (sexual harassment of public employees is of widespread public interest, but personal sexual harassment was a "purely personal grievance[ ]" and not a matter of public concern); *Kuchenreuther*, 221 F.3d at 974-75 (police officer's objections to policy limiting officers to one set of handcuffs not protected despite that police operations and public safety are matters of public concern because objections "addressed only an 'inside' matter pertaining to [her] work condition" (quoting *Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 983 (7th Cir. 2000))).

Stevens goes to great lengths in her brief to attempt to describe her grievance in a manner that implicates public concern. She argues that parents could be concerned that the time spent adhering to the rule would take away from time teachers needed to prepare lessons. She also argues that the public could be concerned that the rule would increase staff turnover. R. 31-1 at 5. But the Court disagrees. Even construing her allegations in the light most favorable to her, the Court is hard-pressed to conclude that a work rule designed to match lessons with

teaching goals could plausibly be regarded as a matter of public *interest* let alone public *concern*.

But even if the topic were of public concern—which the Court doubts—it still fails because there is no evidence that it was motivated by anything other than to benefit Stevens herself. Although described as a "class wide grievance," R. 31-1 at 5; R. 21-1 ¶ 92, that description is not dispositive. *Gray v. Lacke*, 885 F.2d 399, 413 (7th Cir. 1989) (that complaints were purportedly on behalf of all female employees was "indication of public, rather than private, concern," but was "certainly not dispositive."). Instead, Stevens's grievance was nothing more than a "personal dispute 'cloaked in the garb' of [an] institutional grievance[ ]," and was "'not thereby made [a] matter[ ] of public concern.'" *Gray v. Lacke*, 885 F.2d 399, 413 (7th Cir. 1989) (quoting *Berg v. Hunter*, 854 F.2d 238, 242 (7th Cir. 1988)). Indeed, the import to Stevens in particular is clear from the amended complaint, in which she alleges that the rule was "particularly nonsensical" as it related to "*her* students." R. 21-1 ¶ 32. And this in the context of numerous allegations that her relationship with Shelton had suffered by this point. *See generally id.* Stevens's grievance was "inextricably tied to her personal disputes with her supervisors," and cannot be an issue of "public concern." *Gray*, 885 F.2d at 413 (complaints of class-wide sexual harassment arose from mere "personal disputes" where filed after complaints to supervisors about her own harassment and subsequent suspension for insubordination); *Berbas v. Bd. of Educ. of City of Chic.*, 2000 WL 875728, at *3 (N.D. Ill. June 28, 2000) (the court "need not 'ignore any facts alleged in the complaint that undermine the plaintiff's claim'"

that a grievance concerned an issue of public concern versus a "primarily private dispute" (quoting *Whirlpool Fin. Corp. v. GN Holdings*, 873 F. Supp. 111, 123 n. 18 (N.D. Ill. 1995))).

Stevens fails to cite a single case even remotely analogous. And her reliance upon *Gray v. Lacke* only serves to undermine her argument. As explained, the speech there bearing closest resemblance to Stevens's was denied protection. Moreover, the sole incident of speech in *Gray* deemed a public concern is easily distinguished; it involved unequal pay between men and women and no evidence to suggest a purely personal dispute. 885 F.2d at 413-14 (union grievance concerning unequal pay between male and female employees a matter of public concern because directed at Sheriff Department in general and nothing to suggest it was purely personal). Stevens fails to discuss any other case—including those cited by Defendants—in a meaningful fashion. Accordingly, there was no public concern speech warranting protection here.

Stevens contends in the alternative that even if her speech did not address a matter of public concern, the *Connick/Pickering* analysis is an "imperfect fit" with claims like hers involving "deprivation of and/or retaliation for exercising petition and associational rights." R. 31-1 at 6-7. She cites *Hanover Township Federation of Teachers v. Hanover Community School Corporation*, 457 F.2d 456 (7th Cir. 1972) and *Balton v. City of Milwaukee*, 133 F.3d 1036 (7th Cir. 1998) to argue against the application of *Connick/Pickering* here. Her argument is difficult to follow, but neither case compels a favorable result for Stevens. In *Hanover*, the court held that union

members cannot be terminated for union membership; but it expressly *did not* hold that all union-related activity was protected "public concern" speech. 457 F.2d at 460 ("It does not follow, however, that all of a union or its members are constitutionally protected."). And in *Balton*, the court merely noted in dicta that "[a] *Pickering/Connick* balancing test . . . is not easily transferable to freedom of association cases." 133 F.3d at 1039.

Simply put, the speech Stevens asserts as the basis for alleged retaliation was personal in nature and likely would not even begin to approach an issue of public concern even if it were not. *Berry v. Illinois Dep't of Human Servs.*, 2003 WL 22462547, at *12 (N.D. Ill. Oct. 29, 2003) ("Pursuing a matter of individual concern through a union grievance process does not make it protected First Amendment conduct."); *McLaughlin v. Casler*, 634 F. Supp. 2d 881, 891 (N.D. Ill. 2009) (speech not protected where "either related to [plaintiff's] own professional concerns or involved issues of public interest that did not rise to the level of public concern"). Stevens has failed to state a First Amendment retaliation claim. Count IV is dismissed.

### B.     Fourteenth Amendment Equal Protection Claim

Defendants next contend that Stevens fails to state an equal protection claim (Count V). Generally, to state an equal protection claim under Section 1983, Stevens must plausibly allege that: (1) she is a member of a protected class; (2) she was otherwise similarly situated to members of the unprotected class; and (3) she was treated differently from members of the unprotected class. *Moore v. City of Chic.*

16

*Heights*, 2010 WL 148623, at *3 (N.D. Ill. Jan. 12, 2010) (citing *Brown v. Budz,* 398 F.3d 904, 916 (7th Cir. 2005)). Stevens's equal protection claim appears to be founded upon her allegation that Shelton "targeted her for termination" as a result of her union grievance. R. 21-1 ¶ 98. She also alleges that Defendants subjected her—a "successful teacher"—to "harassment[,] and attempt[ed] to besmirch her professional reputation . . . ultimately caus[ing] her to lose her job" without a "rational or reasonable basis for doing so" due to her grievance. *Id.* ¶ 99. Defendants argue that Stevens neither identified the protected class to which she belongs, nor identified any similarly situated individual who was treated differently. R. 25 at 10; R. 38 at 10-11. In response, Stevens argues that "[u]nder a standard of rationality," "she need not show that she was a member of a protected class" to make out her claim. *Id.* She cites no case law to support this argument.

Neither the amended complaint nor the parties' briefs are models of clarity on this issue. But the Court reads Count V as a repackaging of Stevens's failed First Amendment retaliation claim, which serves as grounds to dismiss it on that basis alone.[6] *See Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-92 (7th Cir. 1988) (granting defendants' motion for summary judgment on equal protection claim where complaint alleged plaintiff was "selected for termination in retaliation for the exercise" of right to free speech, but speech was not protected as a matter of law); *see also Thayer v.*

---

[6] Indeed, Stevens's First Amendment retaliation and equal protection claims both state "Because of Ms. Stevens' lawful participation in a class wide grievance challenging unreasonable and oppressive work rules, Defendant Shelton targeted her for termination and enlisted the help of Davlantes and Rhodes." *See* 21-1 ¶¶ 92, 98.

*Chiczewski*, 705 F.3d 237, 255 (7th Cir. 2012) (noting that class-of-one equal protection claim was "seemingly a mere rewording of his First Amendment relation claim," and "[i]t may be proper" to find that the claims . . . fall together"); *Wade v. Collier*, 783 F.3d 1081, 1087-88 (7th Cir. 2015) (dismissing equal protection claim as "merely a rewording" of plaintiff's malicious prosecution claim); *Andrekus v. Bd. of Educ. of Dist. U-46*, 2004 WL 2535274, at *13-14 (N.D. Ill. Sept. 28, 2004) (granting defendants' motion for summary judgment in part because equal protection claim was "merely a rewording of failed First Amendment retaliation claim"); *Kirby v. City Of Elizabeth City, N. Carolina*, 388 F.3d 440, 447 (4th Cir. 2004) ("The claims based on the allegation that [plaintiff] was treated differently in retaliation for his speech are, at their core, free-speech retaliation claims that do 'not implicate the Equal Protection Clause.'" (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 250 (4th Cir. 1999))).

Moreover, to the extent Stevens attempts to rely upon the so-called "class-of-one" theory of equal protection, her claim would fail in any event. The class-of-one theory is designed to "protect individuals against purely arbitrary government classifications," even when a classification "singl[es] out just one person for different treatment for arbitrary or irrational purposes." *Geinosky v. City of Chic.*, 675 F.3d 743, 747 (7th Cir. 2012). It requires a plaintiff to allege that she has been "[1] intentionally treated differently from others similarly situated and that [2] there is no rational basis for the difference in treatment." *Forgue v. City of Chic.*, 873 F.3d 962, 968 (7th Cir. 2017) (citing *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 601-602 (2008)). But the theory "does not apply in the public employment context," and

therefore cannot apply here. *Engquist*, 553 U.S. at 598; *see also Albritton v. Vill. of Dolton*, 2011 WL 4501418, at *9 (N.D. Ill. Sep. 28, 2011) (dismissing equal protection claim with prejudice to the extent plaintiff plead a class-of-one claim, but without prejudice to the extent she sought to bring a class-based claim).[7] Accordingly, Stevens must allege membership in a protected class to proceed. "Normally, we think of the Equal Protection Clause as forbidding the making of invidious classifications— classifications on the basis of such characteristics as race, religion, or gender." *Vukadinovich v. Bd. of Sch. Trustees of Mich. City Area Schs.*, 978 F.2d 403 (7th Cir. 1992) (quoting *Vukadinovich*, 853 F.2d at 1391-92). Stevens does not allege that she was treated differently because of her membership in any of these groups. For all of these reasons, Count V is dismissed.

## C.     Fourteenth Amendment Due Process Claim

Defendants also take issue with Count VI(a) of Stevens's complaint, in which she claims to have lost income without due process in violation of the Fourteenth Amendment. R. 21-1 ¶¶ 100-104. The parties debate in their briefs whether Stevens's lost income as a result of her suspension can be considered "lost property" for purposes of her claim, and Defendants also assert that proper process was (and would be) followed.

A claim under the Fourteenth Amendment here is untenable; the amended complaint fails to allege any facts demonstrating that Stevens enjoyed a protectable

---

[7] This is because the class-of-one theory is "a poor fit in the public employment context," where "government offices could not function if every employment decision became a constitutional matter." *Id.* at 598, 605 (quoting *Connick*, 461 U.S. at 143).

property interest in either continued pay or continued employment with the Board, including because she does not allege that she enjoyed tenure. *Compare Bartlett v. City of Chic. Sch. Dist. #299*, 40 F. Supp. 3d 959, 964 (N.D. Ill. 2014) (tenured teacher had a protected property interest "from, at a minimum, not being fired from his teaching position" and being suspended without full pay).

Stevens cites *Nelson v. Colorado*, 137 S. Ct. 1249 (2018) in support of her due process claim. That case concerned Colorado statutes requiring exonerated criminal defendants to prove their innocence by clear and convincing evidence in order to obtain a refund of costs, fees and restitution paid. *See generally Nelson v. Colorado*, 137 S. Ct. 1249 (2018). It is not applicable here. Stevens cites no other authority. Count VI(a) is dismissed.

### D. Fourth Amendment and False Imprisonment Claims against Shelton

Stevens alleges that Shelton violated her Fourth Amendment rights (Count VI(b)) and falsely imprisoned Stevens (Count XI), in both cases by "refusing to allow Ms. Stevens to leave the building when Shelton told her she was suspended." R. 21-1 ¶¶ 108, 117. The Court addresses each claim in turn.

#### 1. Fourth Amendment

The Fourth Amendment, incorporated against the States by the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. To state a Section 1983 claim under the Fourth Amendment, a plaintiff must plausibly allege that: (1) there was a search or seizure; and (2) the search or seizure was unreasonable.

*Angara v. City of Chic.*, 897 F. Supp. 355, 358 (N.D. Ill. 1995). "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Although typically arising in the criminal context or with regard to police activity, Fourth Amendment protections apply to the actions of all governmental employees. *See Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) ("the strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees" (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1014 n.4 (7th Cir. 2000)).

Here, Stevens alleges in Count VI(b) that she was "seized" within the meaning of the Fourth Amendment when she was told she could not leave school premises following her suspension. R. 21-1 ¶¶ 108, 117. Stevens provides further color in the "Facts" section of her amended complaint, alleging that Shelton "demanded" the keys to Stevens's "personal file cabinet" and when Stevens refused to give her the keys, Shelton refused to let her "remove her personal belongings, [ ] blocked [Stevens's] exit and called the police." *Id.* ¶ 62. Stevens alleges that "[t]his went on for over an hour" until CPS and union attorneys arrived and "told Shelton she needed to allow Ms. Stevens to leave." *Id.* ¶ 63. Stevens cites no case law to support her claim that these allegations state a Fourth Amendment claim. But even if a teacher could maintain a Fourth Amendment claim against a principal (which is not clear), the Court agrees with Defendants that it would be unreasonable for Stevens to believe that she was not free to leave. Stevens's allegations make clear that Shelton "blocked her exit"

*because* Stevens would not return the keys. It appears based on the allegations that Stevens could have left merely by returning the keys. That is not a constitutional seizure. Accordingly, Stevens has failed to allege a plausible Fourth Amendment claim. Stevens's Count VI(b) is dismissed.

### 2.    False Imprisonment

Defendants argue that Stevens also failed to plausibly allege a false imprisonment claim against Shelton for the same reasons they allege her Fourth Amendment "seizure" claim fails; Stevens had a choice. The Court agrees. To state a claim of false imprisonment under Illinois law, Stevens must plausibly allege an "unreasonable restraint of [her] liberty, against [her] will, caused or procured by" Shelton. *Rogers v. Cook*, 2008 WL 5387642, at *3 (N.D. Ill. Dec. 23, 2008) (citing *Meerbrey v. Marshall Field and Co.*, 564 N.E.2d 1222, 1231 (1990)). Stevens again fails to cite any authority or otherwise fully develop her argument. Thus, because according to her amended complaint Stevens was prevented from leaving only because she refused to turn over her keys, the false imprisonment claim (Count XI) is also dismissed.

### E.    Rhodes' Personal Involvement

Defendants contend that Stevens's constitutional claims against Rhodes (Counts IV, V and VI(a)) fail to state a claim against Rhodes because they do not allege his personal involvement in the purported violations. R. 25 at 7.[8] The Court

---

[8] The Court has already dismissed these claims, but addresses this argument for completeness.

agrees. Simply put, Stevens's claims make no specific factual allegations regarding Rhodes, other than to state without more that "Defendant Shelton targeted [Stevens] for termination and enlisted the help of Davlantes and Rhodes." R. 21-1 ¶ 92. Indeed, the only allegations specific to Rhodes appear in Count X—Stevens's battery claim. There, Stevens alleges that Rhodes "blocked her path" when she attempted to leave her classroom, "grabbed her arm" after she asked him not to touch her, and, along with Davlantes, "suspended testing." R. 21-1 ¶¶ 52-54. Stevens argues without citing any authority that these allegations demonstrate that Rhodes was "working in concert with Shelton" and are sufficient. R. 31-1 at 3-4.

Individual-capacity liability under Section 1983 requires a defendant's personal involvement in the alleged constitutional violation. *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003); *see also McGee v. Ill. Dep't of Transp.*, 2004 WL 726110, *3 (N.D. Ill. Apr. 1, 2004) (individual liability does not attach under Section 1983 without personal participation in constitutional deprivation). Stevens's allegations miss the mark; there has been no allegation that Rhodes was "personally involved in the alleged constitutional deprivation" of rights about which Stevens complains. *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014). Accordingly, the Court would grant Defendants' motion as to Stevens's constitutional claims against Rhodes on this ground even if they had survived Defendants' other arguments.

## IV. Defamation Claim Against Shelton

Defendants next take issue with Stevens's defamation *per se* claim against Shelton (Count IX). To plead defamation under Illinois law, Stevens must plausibly

allege that: (1) Shelton made a false statement about her; (2) publication of the statement was not privileged; and (3) Stevens was damaged as a result. *Cox v. Calumet Public Schs. Dist. 132*, 180 F. Supp. 3d 556, 563 (N.D. Ill. Apr. 18, 2016) (citing *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003)). A statement is defamatory *per se* "if the words impute that a person lacks integrity in performing his job." *Goldberg v. Brooks*, 948 N.E.2d 1108, 1113 (Ill. App. Ct. 2011) (citing *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825 (Ill. 2006)).

Here, Stevens alleges that Shelton "falsely accus[ed] Ms. Stevens of 'cheating' on standardized tests" as a "purported and pretextual basis to remove her from her position while the Board investigates." She further contends that these accusations "impugned Ms. Stevens' professional reputation," and created "a cloud around her treatment at South Loop Elementary." R. 21-1 ¶ 111. Defendants do not argue that Stevens fails to state a claim. Instead, they assert that Shelton enjoys absolute statutory immunity from Stevens's defamation *per se* claim under both Section 2-201 and Section 2-210 of the Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-109 ("Tort Immunity Act"). R. 25 at 11-14; R. 38 at 12-14. Stevens argues that Shelton does not qualify for immunity because she was "neither making policy nor exercising her discretion" when she "fabricated allegations" of cheating to "justify her illegal and retaliatory actions against Ms. Stevens." R. 31-1.

## 1. Section 2-210 of the Tort Immunity Act

Section 2-210 of the Tort Immunity Act confers broad immunity upon municipal employees accused of defamation, providing that:

> A public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material.

745 ILCS 10/2-210. "Employee" for purposes of the Tort Immunity Act includes "a present or former officer, member of a board, commission or committee, agent, volunteer, servant or employee, whether or not compensated." 745 ILCS 10/1-202. Thus, under Section 2-210, employees have immunity "even if a statement is defamatory . . . for their statements made within the scope of their authority." *Horwitz v. Bd. of Ed. of Avoca School Dist. No. 37*, 260 F.3d 602, 617 (7th Cir. 2001) (citing *Klug v. Chic. Sch. Reform Bd. of Trustees*, 197 F.3d 853, 861 (7th Cir. 1999)); *see also Cox*, 180 F. Supp. 3d at 563-64 (defendant-superintendent entitled to immunity where plaintiff alleged she "communicated . . . that Plaintiff was discharged for cause to third parties" but alleged no facts supporting "an inference that [defendant] was acting outside of her official authority" when she did so). Although Stevens argues that "making knowingly false statements cannot be within the scope of authority of a public employee," R. 31-1 at 12, the case law is clear that Section 2-210 provides absolute immunity, which "cannot be 'overcome by a showing of improper motivation or knowledge of the statement's falsity, including malice.'" *Horwitz*, 260 F.3d at 618 (quoting *Klug*, 197 F.3d at 861); *see also Goldberg*, 948 N.E.2d at 111 (Section 2-210 provides "broad protection to public employees acting

within the scope of their employment"). Here, a school principal's oversight of teacher-administrated testing is undoubtedly within the scope of the principal's employment. Accordingly, even assuming that Shelton's statements regarding Stevens's alleged "cheating" constituted defamation *per se* within the meaning of Illinois law (which neither the parties, nor the Court address here), Shelton enjoys absolute immunity under Section 2-210 of the Tort Immunity Act, without regard to her motivations. Stevens cites no authority otherwise. Count IX is dismissed.

### 2. Section 2-201 of the Tort Immunity Act

Because the Court dismissed Count IX under Section 2-210 of the Tort Immunity Act, the Court need not decide whether Stevens's defamation claim may also be dismissed under Section 2-201.

## V. Punitive Damages

Defendants argue that Stevens cannot recover punitive damages against either the Board or the individual defendants in their official capacities, and further contend that she also cannot recover punitive damages against the individual defendants in their individual capacities.

### 1. Against the Board and the Individual Defendants in their Official Capacities

Defendants argue that Stevens cannot recover punitive damages from any of the individual defendants in their official capacities or from the Board. R. 25 at 14; R. 38 at 15. Defendants are correct that municipalities and local government entities are immune from punitive damage awards under Section 1983. *Robinson v. City of Harvey, Ill.*, 617 F.3d 915, 916 (7th Cir. 2010) (citing *Newport v. Fact Concepts, Inc.*,

453 U.S. 247 (1981)). Nor are government entities subject to punitive damages under the ADA. *See Blalock v. Ill. Dep't of Human Servs.*, 349 F. Supp. 2d 1093, 1097 (N.D. Ill. 2008) ("42 U.S.C. § 1981a exempts government agencies from judgment for punitive damages, with respect to both Title VII and ADA claims."). Instead, punitive damages may be recovered against government actors only in an individual capacity suit. *See Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) ("punitive damages [may] be recovered against a government actor only in an individual capacity suit"); *Smith v. Wade*, 461 U.S. 30, 35 (1983). But a review of Stevens's amended complaint reveals that she has not sought punitive damages against the Board, and she seeks punitive damages against the individual defendants only in their "personal" capacities. Accordingly, and because the Court has dismissed Defendants' Section 1983 claims against the Board and against the individual defendants in their official capacities in any event, this argument is moot.[9]

## 2. Against the Individual Defendants in Their Individual Capacities

Finally, Defendants argue that Stevens also cannot seek punitive damages from the individual defendants in their individual capacities on any of her constitutional, defamation *per se*, battery or false imprisonment claims (Counts IV, V, VI(a), VI(b), IX, X and XI). R. 25 at 14-15; R. 38 at 15. The Court dismissed

---

[9] Defendants also point out that Stevens failed to respond to their argument that the Board is immune from punitive damages, and thus has waived her opportunity to argue otherwise. *See Alioto*, 651 F.3d at 719. Because the amended complaint includes no prayer for a punitive award as to the Board, and because a punitive award is not available against the Board in any event, the Court need not address this issue.

Stevens's constitutional claims and her defamation and false imprisonment claims in full, so the Court need only address Stevens's prayer for punitive damages on her battery claim against Rhodes (Count X). Defendants argue that the individual defendants (including Rhodes) are immune from punitive damages under Section 2-102 of the Tort Immunity Act. That section provides:

> Notwithstanding any other provision of law, . . . no public official is liable to pay punitive or exemplary damages in any action arising out of an act or omission made by the public official while serving in an official executive, legislative, quasi-legislative or quasi-judicial capacity, brought directly or indirectly against him by the injured party or a third party.

745 ILCS 10/2-102. Section 2-102 therefore confers immunity when both: (1) the defendant is a "public official" within the meaning of the statute; and (2) the defendant served in an official executive, legislative, quasi-legislative or quasi-judicial capacity when he or she engaged in the acts allegedly resulting in injury. *Ohlrich v. Vill. of Wonder Lake*, 2015 WL 4724822, at *4 (N.D. Ill. Aug. 10, 2015).

Stevens argues without citing authority that the individual defendants (including Rhodes) do not qualify for immunity under Section 2-102 because they were not exercising discretion in the performance of a uniquely governmental function as Defendants allege; instead, they were concocting allegations of cheating and "intervening in order to harass" Stevens and cause her students to "score lower" on tests. R. 31-1 at 12-13.

Neither side points out the relative uncertainty regarding whether a public official sued in his or her individual, as opposed to official, capacity can be immune under Section 2-102. *See Ohlrich*, 2015 WL 4724822, at *4-5 (noting that neither the

Illinois Supreme Court nor the Seventh Circuit had addressed whether a police officer could be immune from a punitive damage award under Section 2-102 when sued in his individual capacity, but granting officer's motion for summary judgment regarding punitive damages on battery claim on that basis). The Court is persuaded by the reasoning in recent decisions finding that Section 2-102 may provide immunity from punitive damages when a public official is sued in his or her individual capacity. *See, e.g.*, *Ohlrich*, 2015 WL 4724822, at *4 (finding "no reason to believe that when Section 2-102 refers to *acts* made 'in an official executive . . . capacity' that the statute is somehow restricted to official capacity *claims*" against police officers); *Haug v. Twp. of New Lenox*, 2010 WL 1611070, at *4 (N.D. Ill. Apr. 20, 2010) ("the statutory grant of immunity is broad, and there is nothing in the text of § 2-102 limiting its application to official-capacity suits").

But Defendants fail to establish that Rhodes and the other individual defendants can avail themselves of the Tort Immunity Act. Instead, they merely argue in conclusory fashion that they are "public officials" because they are government employees and contend that they were "exercising discretion in the performance of a uniquely government function" without explaining how that phrase relates to Section 2-102. R. 25 at 14-15; *see Padilla v. Perez*, 2017 WL 345553, at *6 (N.D. Ill. Jan. 24, 2017) (declining to dismiss request for punitive damages under 2-102 where defendants did not attempt to argue that they were public officials and cited no authority to that effect); *Haug*, 2010 WL 1611070, at *4 (declining to strike request for punitive damages under 2-102 where defendants failed "to explain what

[official executive, legislative, quasi-legislative or quasi-judicial capacity"] mean under Illinois law" or "to develop any argument whatsoever that it can be concluded from the allegations of the complaint that defendants acted as public officials functioning in such a capacity."); *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1029 (N.D. Ill. 2003) ("Because the parties have spent so little time on the issue—just one sentence in defendants' brief and no discussion in plaintiff's—the Court believes that the matter is best left for consideration at the summary judgment stage.").

Accordingly, even if Section 2-102 provides immunity from punitive damages in an individual capacity suit, it would be premature to strike Stevens's prayer for punitive damages here. *See Doe ex rel. Doe v. White*, 627 F. Supp. 2d 905, 911 (C.D. Ill. 2009) (declining to strike punitive damages prayer against assistant principal given "paucity of case law interpreting this statute" and parties' failure to address whether he was a "public official" or serving "in an official executive, legislative, quasi-legislative or quasi-judicial capacity."); *Lifton v. Bd. of Educ. of City of Chic.*, 290 F. Supp. 2d 940, 946 (N.D. Ill. 2003) ("it is simply too early to determine whether [principal] was serving in an official capacity while engaged in the alleged conduct"). The Court declines to do so. Stevens's prayer for punitive damages as to Rhodes on Count X stands.

## Conclusion

For these reasons, the Court grants Defendants' partial motion to dismiss on each of Counts II, IV, V, VI(a), VI(b), IX and XI, but denies Defendants' motion to

strike Stevens's prayer for punitive damages as to Rhodes on Count X, R. 25. Counts

I, III and X—which were not the subject of Defendants' motion to dismiss—remain.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: March 18, 2019